UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANGELA MACROPOULOS,

                              Plaintiff,

        – against –

METROPOLITAN LIFE INSURANCE
COMPANY,

                              Defendant.

**OPINION AND ORDER**

15 Civ. 6096 (ER)

---

Ramos, D.J.:

Angela Macropoulos ("Macropoulos" or "Plaintiff") brings this action against

Metropolitan Life Insurance Company ("MetLife" or "Defendant") under the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8–107, and the Family Medical Leave Act ("FMLA"), 29

U.S.C. § 2601 *et seq.*, alleging that she was discriminated against—and ultimately fired—due to

her caregiving responsibilities.  *See* Compl. (Doc. 1).  On April 3, 2017, MetLife moved for

summary judgment on all of Macropoulos' claims.  *See* Doc. 43.

For the following reasons, MetLife's motion is granted.

## I.      FACTUAL BACKGROUND[1]

### A.      Macropoulos' Hiring and Tenure under Davis' Supervision

In January 2007, Macropoulos began work as a temporary contract attorney at MetLife.

---

[1] The following facts are drawn from the Complaint (Doc. 1), Defendant's Rule 56.1 Statement of Material Facts (Doc. 47), Plaintiff's Rule 56.1 Statement (Doc. 59), Defendant's Reply (Doc. 64), and the parties' supporting submissions.  For ease of reference, the Court will cite to Defendants' Reply 56.1 Statement, which contains all of the parties' assertions, responses, and replies.

*See* MetLife's Reply 56.1 Statement of Material Facts ("56.1") (Doc. 64) ¶ 1.[2] During her employment interview, Macropoulos had asked Len Davis ("Davis")[3] whether MetLife would be amenable to a flexible work arrangement, because Macropoulos' mother ("Mrs. Macropoulos") had recently left the hospital and Macropoulos had not yet hired a home health aide. *Id.* ¶¶ 2–3, 167. Macropoulos began working at MetLife and started telecommuting a few days per week. *Id.* ¶ 8. She generally telecommuted on Fridays and at least one other day during the week. *Id.* ¶¶ 11, 170.[4] She occasionally telecommuted for a third day if her mother's condition required it. *Id.* ¶ 170.

During Macropoulos' trial period, Davis was her direct supervisor. *Id.* ¶ 9. Davis required employees to inform him of their schedules in advance, but gave them the flexibility to choose which days they would telecommute (if at all). *Id.* ¶¶ 10, 12, 181–83. Davis required attorneys to work for eight hours a day, although he did not require all eight hours of work to be performed in the office. *Id.* ¶¶ 186–87. In May 2007, Davis offered Macropoulos a permanent position, which she began in July 2007. *Id.* ¶¶ 5–6.

In 2008, Macropoulos began reporting to Andrew Varady ("Varady"), who in turn reported to Davis. *Id.* ¶ 13. Varady continued to accommodate Macropoulos' request for flexibility to care for her mother, and asked to be informed of her telecommuting schedule in advance. *Id.* ¶¶ 14–15.[5]

---

[2] Prior to her work at MetLife, Macropoulos had worked at PricewaterhouseCoopers, where she worked in the tax and legal services department; Reed Smith, where she advised employment and labor practice attorneys on COBRA and FMLA issues; and Sills Cummis, where she worked in employee benefits and executive compensation. *Id.* ¶¶ 150, 152–53, 157.

[3] Davis was, at that point, the head of MetLife's Product Tax/ERISA Unit. *Id.* ¶ 2.

[4] Other attorneys also telecommuted on varying days of the week, including Andrew Varady. *See id.* ¶ 11.

[5] He made the same request of other employees, including Martin Kahan. *Id.*

## B. Macropoulos' Tenure and Termination under Zanghi's Supervision

In August 2013, Phyllis Zanghi ("Zanghi") replaced Davis as the head of the Product Tax/ERISA Unit. *Id.* ¶ 225. When this occurred, Davis told Macropoulos that he had discussed Mrs. Macropoulos' condition with Zanghi and informed her of Macropoulos's flexible telecommuting schedule. *Id.* ¶ 227. [6] Davis also advised Macropoulos to "keep [her] head down" and "watch out" for herself. *Id.*

On September 6, 2013, Macropoulos had a mid-year review with Varady and Zanghi. *Id.* ¶ 228. [7] Varady told Macropoulos that she made an "excellent contribution" to the Unit and "had done very good work." *Id.* ¶¶ 232–33. Varady added that feedback from clients was that her work had "consistently been of high caliber." *Id.* ¶ 234. Zanghi added that Varady believed Macropoulos was "making tremendous valuable contributions to [the] group." *Id.* ¶ 235.

However, Zanghi also stated that Macropoulos' accessibility was a problem, because she frequently arrived between noon and 1:00 p.m. and left the office between 5:30 p.m. and 6:00 p.m. *Id.* ¶ 50. Macropoulos told Zanghi that when she began working at MetLife, she understood that she would have the flexibility she needed to care for her mother. *Id.* ¶ 52. [8] In response, Zanghi emphasized that MetLife's law department was reducing in size over the next few years, and that she felt there was a "perception problem" with respect to Macropoulos. *See*

---

[6] MetLife argues that Davis' statements are hearsay, citing Rule 801(c) of the Federal Rules of Evidence. *See* Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Reply Mem.") (Doc. 62), at 2. But Rule 801 also makes clear that a statement is not hearsay when it was made by an opposing party's agent or employee and is being offered against that party. *See* Fed. R. Evid. 801(d)(2)(D). Although Davis left MetLife's employment at some point in 2013, Defendant has not shown that he was no longer employed by MetLife at the time he made this statement, and the statement was offered to Davis' direct report about her work position. Davis' statement, therefore, is admissible.

[7] Macropoulos recorded this meeting on her iPhone. *Id.* ¶ 57. This was contrary to MetLife policy. *Id.*

[8] Several months later, on December 19, 2013, Zanghi wrote a memo to herself summarizing the meeting with Macropoulos. Zanghi wrote that Macropoulos "indicated that her mother is very ill and needs constantly to be brought back and forth to doctor's appointments and that is the reason for her very flexible schedule." Zanghi then stated that she "told [Macropoulos] that her care giver needs were not my concern." *Id.*

Declaration of James O'Keefe ("O'Keefe Decl.") (Doc. 45) Ex. 12. Varady added that he and others in the Unit had "issues with [the] timeliness" of Macropoulos' work product. *Id.* Zanghi also informed Macropoulos that she was perceived as someone who yelled at her colleagues in the office. *Id.*

During the meeting, Zanghi told Macropoulos that she would have to fill out a flexible work arrangement ("FWA") form. 56.1 ¶¶ 51, 240. [9] Zanghi also explained that Macropoulos should select two fixed telecommuting days, and arrive in the office between 9:00 and 9:30 a.m. three days per week. *Id.* ¶¶ 53, 54. Zanghi added that she could not give final approval for the FWA form, but that she would give the paperwork to her supervisor. *Id.* ¶ 241.

On September 25, 2013, Zanghi emailed Macropoulos with additional thoughts about Macropoulos' telecommuting. Zanghi informed Macropoulos that she was "not agreeable" to Macropoulos telecommuting for more than two days per week, but that if Mrs. Macropoulos "ha[d] a health emergency . . . on rare occasions," she would understand Macropoulos' need to work from home for a third day. *Id.* ¶ 247. [10]

That same day, Zanghi emailed Varady about Macropoulos. *Id.* ¶¶ 248–49. Zanghi explained that it would be "very easy" to find a replacement for Macropoulos. She explained her position that if Macropoulos could not implement a more fixed telecommuting schedule, "she cannot work [at MetLife]." *Id.* She indicated that she had spoken with Human Resources ("HR") about Macropoulos, and that "HR's position is that if she needs a very regular alternative work situation because of a family member's health then she can take FMLA with the

---

[9] The second page of the FWA form instructed employees that: "If you think the alternative work request may fall under the Family and Medical Leave Act (FMLA) or the Americans with Disabilities Act (ADA) consult with Employee Relations. Do not use this process." *Id.* ¶ 72.

[10] Zanghi and Macropoulos had a similar conversation by phone on September 27, 2013. *Id.* ¶¶ 68–70.

appropriate paperwork from a physician." *Id.* Despite mentioning FMLA leave to Varady, neither Zanghi nor any other MetLife employee discussed the availability of FMLA leave with Macropoulos. *Id.* ¶ 250. When Macropoulos explained that she had to take Mrs. Macropoulos to several doctor's appointments, for example, Zanghi simply replied that the time Macropoulos spent commuting to or waiting at doctor's appointments could not be counted as work time. *Id.* ¶ 252.

On October 7, 2013, Macropoulos submitted a draft of the FWA form. *Id.* ¶ 71. Macropoulos selected Tuesdays and Fridays as telecommuting days, and explained that "there may be times where the telecommute days need to be adjusted for a healthcare provider's schedule, or the nature o[r] urgency of my mother's medical condition." *Id.* ¶ 74. Macropoulos, with Zanghi's and Varady's input, continued to work on additional paperwork necessary to formalize her work schedule. *Id.* ¶¶ 75–78, 80. 261–62. Ultimately, Macropoulos states that she never learned whether her request for fixed telecommuting days was granted. *Id.* ¶¶ 269, 274.

Later that year, Macropoulos filled out her annual self-assessment and sent it to Varady and Zanghi for review.[11] On November 27, 2013, Varady edited the review with his input and wrote an additional goal for Macropoulos: "I need to consistently arrive on time to the office, and to consistently meet project deadlines." *Id.* ¶ 138. Zanghi then edited the review further and added:

> Having [Macropoulos] report to the office on a reliable basis with known and expected work hours has been a great challenge. After months of reminders [Macropoulos] is coming to the office three times a week, but often (a few times a week) misses her scheduled 9:30 start time. Also, despite numerous requests, [Macropoulos] has

---

[11] At MetLife, performance was evaluated annually through the use of professional development plans ("PDPs"). *Id.* ¶ 134. In November, an employee will complete a self-assessment and list her accomplishments for that year. *Id.* ¶ 135. The employee's supervisor then reviews the document, makes comments, and suggests an overall rating for that employee. *Id.* ¶ 136.

> not set two predictable work-at-home days per week. All of this
> unpredictability plus a history of missed deadlines has led her
> management to give her only long-term assignments, which means
> that she is not as valuable as others. . . . Finally, Angela can be
> disagreeable and during this year has raised her voice with [Varady]
> and me. Everything that [Macropoulos] does not want to do (e.g.
> solidify work hours, arrive on time) is a difficulty.

*Id.* ¶ 139. Zanghi entered an overall "unsatisfactory" rating for Macropoulos. *Id.* After completing all of the reviews for the Unit, Zanghi met with her direct reports (who were mid-level managers like Varady) to discuss how each employee was rated and ranked. *Id.* ¶ 140. The group ranked Macropoulos at the bottom of the Unit. *Id.* ¶ 141.

After that meeting, on December 4, 2013, Zanghi emailed HR about Macropoulos. *Id.* ¶ 298. She stated that Macropoulos "gets her work done" and was "less difficult and has begun to show up as asked." *Id.* [12] Zanghi noted, however, that while in the office, Macropoulos spent significant time scheduling appointments for herself and for her mother. *See* Declaration of Debra Raskin ("Raskin Decl.") (Doc. 53) Ex. QQ. She added that Macropoulos' colleagues referred to her as "obnoxious" and that Macropoulos had a lighter work load than other attorneys in the Unit. *Id.* Zanghi expressed that Macropoulos was "definitively" the "lowest value member" of the Unit, but stated:

> I am concerned about rating her unsatisfactory because [Davis] and
> [Varady] let her enter such soft ball goals into the system that she
> met them all. . . . I fear we may end up terminating [Macropoulos]
> and I know that she will claim age and disability discrimination, but
> the truth is she bullied two weak leaders into letting her decide what
> work she would do and what her hours were.

*Id.*; 56.1 ¶ 299. Although neither party has put HR's response in the record, on December 6, 2013, Zanghi instructed Varady to list "unsatisfactory" as the official rating for Macropoulos.

---

[12] Varady also testified, in his deposition, that Macropoulos complied with the request that she telecommute on a consistent schedule, absent an emergency." *Id.*

56.1 ¶ 144.  According to Varady, by December 6, 2013, MetLife had already substantially decided to terminate Macropoulos, and there was nothing Macropoulos could do to alter the decision.  *Id.* ¶ 303.  In either late December 2013 or January 2014, Varady recommended that MetLife terminate Macropoulos' employment.  *Id.* ¶ 146.  Zanghi agreed, and Macropoulos was fired on January 29, 2014.  *Id.* ¶¶ 147, 149.

### C.    Macropoulos' Performance

Predictably, the parties disagree substantially about Macropoulos' performance during her six year tenure and the extent to which she was put on notice that she was at risk of being terminated.

### 1.    Lateness

According to MetLife, the company provided Macropoulos with flexibility if her latenesses were related to her mother; however, on most days, her lateness was unrelated to her mother.  *Id.* ¶¶ 16, 86–96.[13]  Although Macropoulos disputes the frequency of those occurrences, she admits that she was occasionally late for reasons not directly related to her mother's care.[14]  For example, Macropoulos informed Varady of late arrivals due to her own doctor's appointments on August 10, 2010, April 1, 2013, and April 8, 2013.  *Id.* ¶¶ 19, 21, 22.[15]  On March 17, 2011, Macropoulos was twenty minutes late to a meeting, *id.* ¶ 29, and on October 10, 2011, she joined a conference call half an hour late, *id.* ¶ 30.

---

[13] According to Macropoulos, other attorneys were able to arrive late due to doctor's appointments or for other personal reasons, including Varady and Byron Rose.  *Id.* ¶ 88.  Macropoulos also contends that "in a certain sense, all circumstances of late arrivals related to my mother" because her ability to schedule personal appointments "was extremely limited due to [her] caregiving responsibilities."  *See* Declaration of Angela Macropoulos ("Macropoulos Decl.") (Doc. 54) ¶ 117.

[14] Macropoulos admitted that she "occasionally required flexibility for personal reasons that were unrelated to her mother," including because a train would "break down" during her commute.  *Id.* ¶ 16.

[15] Macropoulos points out that in Varady's deposition, he explained his view that illnesses, emergencies, car breakdowns, or train delays were all acceptable reasons for an employee's lateness.  *Id.* ¶ 16.

The parties also dispute exactly when Macropoulos' work day was supposed to begin. MetLife argues that the work day began at 9:30 a.m., and that Zanghi communicated this requirement to Varady and later to Macropoulos herself on multiple occasions. *Id.* ¶¶ 43–44, 53, 68–69, 100. Macropoulos points to testimony from Varady that he, Zanghi, and Macropoulos agreed that Macropoulos had to be in the office by 9:45 a.m. *Id.* ¶ 43.

## 2. Accessibility

Varady stated that he had difficulty reaching Macropoulos while she telecommuted. *Id.* ¶¶ 82, 84–85. Macropoulos, however, stated that she was "consistently reachable" while telecommuting, and both parties agree that she provided her home and cell phone numbers to her supervisors. *Id.* ¶ 191. Douglas Scully, senior counsel at MetLife and an internal client, stated that although he was "aware that Macropoulos was the primary caregiver for her ill and permanently disabled mother . . . [she] was always available when [he] needed her, including evenings after regular work hours." *Id.* ¶ 192. Similarly, Christine Harman, a former assistant vice president at MetLife, stated that she "never had any difficulty in reaching Macropoulos." *Id.* ¶ 193. Additional clients referred to Macropoulos as "always available and always responsible." *Id.* ¶¶ 194, 212.

## 3. Telecommuting Flexibility

According to Macropoulos, Zanghi did not have any Unit-wide meetings to discuss new standards around paid time off, telecommuting, or flexible work arrangements, *id.* ¶ 284, and other Unit attorneys continued to have the same flexibility with respect to their work schedules under Zanghi that they had under Davis. *Id.* ¶¶ 44, 285–88, 292. Although Macropoulos was asked to email Zanghi and Varady every Sunday evening or Monday morning with her telecommuting schedule for the week, Macropoulos stated that other Unit attorneys were able to

switch telecommuting days at their own convenience without sanction from Varady or Zanghi. *Id.* ¶¶ 289–91.

MetLife, on the other hand, states that all attorneys in the Unit were asked to fill out FWA forms if they wanted to telecommute, and could not subsequently alter their telecommuting days unless there were exceptional circumstances. *Id.* ¶¶ 46–48; Declaration of Phyllis Zanghi (Doc. 48) ¶¶ 3–6. Zanghi contends that Macropoulos' ability to select her telecommuting days at the beginning of the week was, therefore, an accommodation to her. *Id.*

### 4. **Work Product**

According to MetLife, Macropoulos "had difficulty" meeting assignment deadlines. *Id.* ¶ 105. Macropoulos maintains that any lateness in providing assignments to Varady was due largely to his inability to provide clear deadlines and instructions for assignments. *Id.* ¶¶ 109–119. Macropoulos also points to testimony from clients Douglas Scully and Christine Harman and another attorney in the Unit, Byron Rose, that her work product was generally delivered in a timely fashion. *Id.* ¶¶ 214–16. Additionally, William Arbo, a senior vice president at MetLife, stated in Macropoulos' 2012 review that "without [her] help and work ethic . . . we never would have completed these projects on time." *Id.* ¶ 212.

MetLife also points to three occasions in which Macropoulos did not satisfactorily complete an assignment. *Id.* ¶¶ 121, 124–26. Macropoulos argues that on the first occasion, she reached out to Varady when she was unable to find the information requested, explained her research steps, and informed him that she would continuing looking. *Id.* ¶ 121. On the second, Macropoulos informed Ted Wozny that she could not complete a project he assigned to her because it required tax expertise rather than ERISA expertise. *Id.* ¶ 124–25. Macropoulos

admits, however, that in one research assignment she overlooked relevant Second Circuit case law. *Id.* ¶ 126.

### 5. **Behavior**

The parties disagree about the extent to which Macropoulos' behavior in the workplace was problematic. According to MetLife, Macropoulos frequently yelled and used obscenities in the office; Macropoulos admits that her voice "carrie[d]" in the office and that that she occasionally used profanity, but denies ever yelling or directing an obscenity toward a particular person. *Id.* ¶ 133. Macropoulos also states that other attorneys in the Unit used profanity. *Id.*

The parties do agree, however, on a few instances of Macropoulos' conduct. On December 19, 2013, Varady went into Macropoulos' office to discuss her lateness. *Id.* ¶ 128–29. Macropoulos complained that Varady was treating her like "a f***ken line worker at Ford" and called Zanghi a "lunatic." *Id.* ¶ 130. Macropoulos does not deny this account, but notes that Varady never told Macropoulos that it was inappropriate to refer to Zanghi as a "lunatic." *Id.* The next day, when Varady spoke to Macropoulos about a conference call, she asked him "if this is kindergarten." *Id.* ¶ 131.

Macropoulos also admits that she called Zanghi "the witch;" but she notes that several employees in the Unit did this because of a sign on Zanghi's file cabinet that read "the witch is in." *Id.* ¶ 132. According to Macropoulos, Varady never told her it was inappropriate to refer to Zanghi as "the witch." *Id.*

### 6. **Reviews**

In 2008, Macropoulos received her first performance review. The review referred to her performance on projects as "very good work" and a "great job." *Id.* ¶ 32. In 2009, her review stated that she possessed a "fine knowledge of ERISA" and "excellent communication skills."

*Id.* In 2011, Varady wrote that Macropoulos had "excellent results" and performed "outstanding work." *Id.* Varady also noted that "if there is something still needing greater attention it is the need in some instances to more quickly respond to a deadline." *Id.* In 2012, he wrote that she was a "successful contributor" who "generally exceed[ed] objectives." *Id.* ¶ 32. That year, internal MetLife clients also described Macropoulos as "excellent," "superb," "proactive," and "a pleasure to work with." *Id.* However, clients also stated that Macropoulos had a "strong personality" and should "consider pulling back." *See* Raskin Decl. Ex. S.

In February 2013, in anticipation of her 2013 review, Macropoulos wrote that one of her development strategies for the year would be "to timely deliver work product and sufficiently communicate challenges regarding work to my managers." Macropoulos Decl. Ex. 8.

### 7. **Performance Warnings**

According to MetLife, Varady told Macropoulos on multiple occasions that she could be terminated if she continued to arrive late and/or miss assignment deadlines. *Id.* ¶¶ 31–32, 101. Macropoulos denies ever having such a conversation with Varady. *Id.*; *id.* ¶ 217. According to Macropoulos, her last performance review with Davis was in February 2013. *Id.* At that point, Davis and Varady told her that her 2012 performance was "satisfactory" and did not tell her she was at risk of being disciplined in any way. *Id.*

The parties disagree about whether Zanghi and Varady warned Macropoulos about her performance on November 11, 2013. According to Macropoulos, she arrived at the office on time that day and informed Varady that she was "being targeted" by his practice of standing in the hall to see when she arrived, but did not have a full meeting with Zanghi and Varady. *Id.* ¶¶ 266–68. MetLife states that Macropoulos received a "second and final" warning from Zanghi

11

and Varady about her performance on that day. *Id.* She was fired two months later, on January 29, 2014. *Id.* ¶¶ 147, 149.

### D. Procedural History

On August 4, 2015, Macropoulos brought the instant litigation against MetLife, raising four causes of action: FMLA interference (Claim 1), FMLA retaliation (Claim 2), disability discrimination under the ADA (Claim 3), and disability discrimination under the NYCHRL (Claim 4). *See* Compl. (Doc. 1). On April 3, 2017, MetLife moved for summary judgment on all of Macropoulos' claims. *See* Doc. 43.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might "affect the outcome of the litigation under the governing law." *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)

(quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in

opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51

F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some

metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.

2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

(internal quotation marks omitted)). To defeat a motion for summary judgment, "the non-

moving party must set forth significant, probative evidence on which a reasonable fact-finder

could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*,

477 U.S. 242, 256–57 (1986)). Nonetheless, "summary judgment may not be granted simply

because the court believes that the plaintiff will be unable to meet his or her burden of persuasion

at trial. There must either be a lack of evidence in support of the plaintiff's position or the

evidence must be so overwhelmingly tilted in one direction that any contrary finding would

constitute clear error." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (internal

citations omitted).

Courts are cautious in granting summary judgment in employment discrimination cases

where the employer's intent is at issue. *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir.

2008). However, "[s]ummary judgment is appropriate even in discrimination cases, for . . . the

salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—

apply no less to discrimination cases than to other areas of litigation." *Hongyan Lu v. Chase Inv.*

*Servs. Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224

F.3d 33, 41 (2d Cir. 2000)). Indeed, "[i]t is now beyond cavil that summary judgment may be

appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)). Furthermore, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137; *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). A "nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

## III.    ASSOCIATION DISCRIMINATION

Macropoulos brings two claims alleging discrimination on the basis of disability, arising under the Americans with Disabilities Act and the New York City Human Rights Law. MetLife argues that Macropoulos was fired for her unsatisfactory performance, and that there is no evidence in the record that would allow a reasonable juror to find in Macropoulos' favor. *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") (Doc. 44), at 25.

### A.    Applicable Legal Standard

The Americans with Disabilities Act prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Plaintiff argues that under an association discrimination claim, she must show that her association with a person with a known disability "motivated" the decision to fire her. *See* Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") (Doc. 58), at 8. Defendant argues that the test is more exacting—that Plaintiff must

show that her association was a "determining" factor in the termination. Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Reply Mem.") (Doc. 62), at 1.

Defendant is correct. In the Second Circuit, to state an "associational discrimination" claim, a plaintiff must make out a *prima facie* case by establishing: "1) that she was qualified for the job at the time of an adverse employment action; 2) that she was subjected to adverse employment action; 3) that she was known at the time to have a relative or associate with a disability; and 4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016). Courts then apply the familiar *McDonnell Douglas* framework, in which "a plaintiff must establish a *prima facie* violation, which shifts the burden to the defendant to advance a legitimate, non-discriminatory reason for its actions, at which point the final burden is on the plaintiff to show that the defendant's proffered reason is pretextual." *Lawson v. Homenuk*, 710 F. App'x 460, 462 (2d Cir. 2017).

### B.     Discussion

#### 1.     *Prima Facie* Showing

To make her *prima facie* showing that her claims are entitled to survive summary judgment, Macropoulos argues that she has presented two types of evidence sufficient for a juror to infer that her mother's disability was a determining factor in her termination.

First, Macropoulos points to three statements made by and about Zanghi that she argues show Zanghi's bias against Macropoulos. In a September 25, 2013 email from Zanghi to Varady, Zanghi wrote that it would be easy to find a replacement for Macropoulos and referred to Macropoulos' need to have "a very regular alternative work situation because of a family

member's health." 56.1 ¶ 249. Zanghi later informed HR that she "fear[ed] we may end up terminating [Macropoulos] and I know she will claim age and disability discrimination." *Id.* ¶ 299. Macropoulos also highlights Davis' warning that she should "keep [her] head down" and "watch out" when Zanghi took over as head of the Unit. *Id.* ¶ 227. Defendant argues that these statements cannot support an inference that Zanghi was biased against Macropoulos because Macropoulos' mother was ill, because they merely reflect the reality that Zanghi required Macropoulos to conform to MetLife's standards for telecommuting and that Zanghi was aware Macropoulos might bring litigation against MetLife upon her termination. Reply Mem. at 1–2.

Second, Macropoulos points to the different, and more favorable, treatment MetLife gave to her colleagues who were not known to associate with people with disabilities. Specifically, Macropoulos argues that after Zanghi took over from Davis, other colleagues in the Unit enjoyed the "same flexibility" with respect to telecommuting. Byron Rose, for example, noted that he did not recall a change in telecommuting policies after Zanghi became head of the Unit and that he "continued to have the same flexibility as I had previously." Declaration of Bryan Rose ("Rose Decl.") (Doc. 56) ¶ 10.[16] Macropoulos also points to the treatment of Ted Wozny and Martin Kahan, two other attorneys in the Unit. Wozny arrived late or asked to telecommute without prior notice on six occasions between December 20, 2013 to April 3, 2014. 56.1 ¶ 44. Kahan was late on six occasions between December 10, 2013 and April 17, 2014. *Id.* ¶ 88. In a similar time period (October 9, 2013 to January 28, 2014), Macropoulos was late eight times. *See* 56.1 ¶¶ 89–96.[17] MetLife argues that "even if other Unit attorneys arrived late on occasion without

---

[16] Rose resigned in September 2013; he therefore worked under Zanghi for only one month. *Id.* ¶ 11.

[17] MetLife alleges that Macropoulos was late three times during the month of November. *Id.* ¶ 91. To support this contention, MetLife points to an email from Varady to Zanghi dated November 23, 2013 in which he stated that Macropoulos was late three times that month. *Id.* He also stated that on all of those occasions, she was at work by 10:00 a.m. Macropoulos states that she was only late once that month, on November 6, 2013. *Id.* Taking all

sanction, that fact does not support an inference that Plaintiff experienced discrimination."
Reply Mem. at 3.

The burden of establishing a *prima facie* case of discrimination is "minimal." *See Vuona v. Merrill Lync & Co.*, 919 F. Supp. 2d 359, 372 (S.D.N.Y. 2013) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *see also Dawson v. New York City Transit Auth.*, 624 F. App'x 763, 766 (2d Cir. 2015) ("Accordingly, the burden that a plaintiff must satisfy in order to establish her initial *prima facie* case has been described as 'not onerous,' and 'minimal and *de minimis*.'") (internal citations omitted). Here, assessing the comments by and about Zanghi in the light most favorable to Macropoulos, the Court views them as neutral, at best.

Macropoulos has pointed to two colleagues who had similar issues with tardiness, but who were treated differently than she was. MetLife argues that these examples are irrelevant because the ADA does not require employers to accommodate the schedule of an employee who has an association to a person with a disability. Reply Mem. at 3 n.4; *see also Graziadio*, 817 F.3d at 433. Macropoulos' argument, however, is not that MetLife did not accommodate her schedule; it is that they viewed her lateness more harshly because they believed her mother's condition made Macropoulos less dedicated to her work. *See Graziadio*, 817 F.3d at 432 (explaining the "distraction" theory of associational discrimination under the ADA). Indeed, one of MetLife's three stated reasons for terminating Macropoulos' employment was that she "routinely arrived late to the office for reasons unrelated to her mother's care." Def.'s Mem. at 1. To demonstrate that MetLife did in fact treat her differently, Macropoulos has put forward evidence showing that other employees were treated more favorably when they were unexpectedly late. *See Vuona*, 919 F. Supp. 2d at 372 (explaining that evidence of differential

inferences in favor of Macropoulos, the non-moving party, the Court finds that a reasonable juror could conclude that she was late only once in November.

17

treatment may support a finding that the plaintiff has made a *prima facie* case). The Court finds

that Macropoulos has met the minimal burden of demonstrating a *prima facie* case of

associational discrimination.

### 2. MetLife's Stated Reason for Macropoulos' Termination

Under the *McDonnell Douglas* framework, the burden next shifts to the Defendant to

show a legitimate, non-discriminatory reason for termination. MetLife argues that Macropoulos

was terminated for unsatisfactory performance—namely, she was frequently late to work for

reasons unrelated to her mother, she submitted inaccurate or late work product, and she "engaged

in insubordinate behavior." Def.'s Mem. at 1; *see also* Part I.C. *supra*. Each of these reasons is

a legitimate, non-discriminatory reason for an employee's dismissal. *See Carter v. New Venture

Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009) ("[The defendant] has met its burden of

articulating a legitimate, nondiscriminatory reason for its actions, namely, [the plaintiff's]

perceived lack of productivity . . . ."); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 179–80 (S.D.N.Y.

2011) (finding that an employer met its burden by pointing to three instances of insubordination);

*Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001) ("[The] plaintiff's

lateness is a legitimate, nondiscriminatory reason for his discharge.").

### 3. Pretext

The burden thus returns to Macropoulos, who must show "sufficient evidence to support

a rational finding that the legitimate nondiscriminatory reasons proffered by the defendant were

false, and that more likely than not discrimination was the real reason for the employment

action." *Weinstock*, 224 F.3d at 42 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d

708, 714 (2d Cir. 1996) (internal punctuation marks omitted)). "To get to the jury, it is not

enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of

intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519 (internal quotation and punctuation marks omitted)). Macropoulos offers four arguments to demonstrate that MetLife's stated reasons for terminating her employment were mere pretext: (1) comments made by and about Zanghi demonstrate bias against Macropoulos; (2) Macropoulos' work product was neither late nor unsatisfactory; (3) differential treatment of similarly situated employees; and (4) her prior performance reviews contradict MetLife's current position that her performance was unsatisfactory. *See* Pl.'s Mem. at 10–15.

### a) Comments

As discussed above, Macropoulos points to two comments made by Zanghi, and one comment made by Davis about Zanghi, to show discriminatory intent. The Court does not find that Davis's comment, warning Macropoulos to "keep [her] head down" and to "watch out" for Zanghi, could support a finding of bias. Macropoulos herself notes that Davis did not provide any further detail or context when making this statement. *See* 56.1 ¶ 227. It is possible that Davis meant for Macropoulos to understand that Zanghi was biased against her because of her caregiving responsibilities; however, it is just as likely that Davis was warning Macropoulos about Zanghi for some other reason, such as that Zanghi was generally a more demanding supervisor than he was, or that he was simply trying to tell Macropoulos that she should focus on her work. Without more from Davis that could explain the remarks, the Court would need to resort to pure speculation to conclude that these comments, on their own, show evidence of bias that indicate the reason for Macropoulos' termination was merely pretextual.

Similarly, although Zanghi's comments are directly related to Macropoulos' termination, they do not evince bias. Zanghi's first comment, made in September 2013, states that if Macropoulos cannot "really live with and implement" the formal FWA documentation, then "she

cannot work [at MetLife]." 56.1 ¶ 249. The email also states that "if [Macropoulos] needs a very regular alternative work situation because of a family member's health then she can take FMLA." *Id.* Macropoulos argues that the statement shows "Zanghi's eagerness to fire Macropoulos," and is discriminatory because Zanghi "linked that [eagerness] to Plaintiff's possibly taking FMLA leave to care for her mother." Pl.'s Mem. at 10–11. But Zanghi's statements simply reflect the reality that an at-will employee may be fired for failing to adhere to a company's work policies, and that FMLA leave is available to employees who need time off to care for themselves or their relatives.

Finally, Zanghi's second comment predicted that if Macropoulos were to be fired, she might bring a lawsuit alleging disability discrimination. 56.1 ¶ 299. Macropoulos argues that "bias regarding plaintiff's association with her disabled mother could be inferred from those comments alone." Pl.'s Mem. at 9. While these comments show that Zanghi was aware of Mrs. Macropoulos' condition, and predicted that a lawsuit might occur, the comments do not show that Zanghi unfairly assumed Macropoulos was distracted at work because of her caregiving responsibilities or that she was fired because of her mother's condition. The Court finds that none of the comments put forward by Macropoulos demonstrates that MetLife's stated reasons for terminating her were mere pretext.

### b) Differential Treatment

Plaintiff also argues that MetLife treated other employees differently, which shows that MetLife's stated reasons for terminating her employment were mere pretext. Pl.'s Mem. at 11–12; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir. 2010) (noting that evidence of differential treatment can be relevant at both the *prima facie* and pretextual stages of analysis). Plaintiff points not only to the fact that other employees were late with the same

frequency, which the Court discussed in Part III.B.1 *supra*, but also that other employees were similarly situated to her with respect to use of profanity in the office and allegedly unsatisfactory performance. Pl.'s Mem. at 12.

As discussed above, one of MetLife's stated reasons for Macropoulos' termination was insubordination, as evidenced by her use of profanity and yelling at Varady, her direct supervisor, on at least two occasions. Def.'s Mem. at 10, 25. Macropoulos does not deny these incidents. Rather, she argues that other Unit attorneys used profanity and were not sanctioned. Pl.'s Mem. at 12 n.10; 56.1 ¶ 127. Macropoulos does not expand on how any of those attorneys used profanity, nor does she explain whether they ever directed profanity toward a supervisor in anger. Finally, Macropoulos also argues that she was subject to differential treatment because she received only one oral warning regarding her lateness prior to her termination, while another lawyer in the Unit, Elizabeth Oyen, received multiple written warnings over the course of a year and a half. Pl.'s Mem. at 12.[18]

Macropoulos has attempted to put forward evidence showing that Unit attorneys who engaged in similar conduct were not terminated from MetLife. But Macropoulos misunderstands her burden with respect to differential treatment. To raise an inference of discrimination, a plaintiff must show that she was "similarly situated to other employees outside her protected group," and that "she was treated less favorably than those employees." *Setelius v. Nat'l Grid*

---

[18] Macropoulos also argues that Zanghi's failure to follow internal MetLife guidelines on disciple also demonstrates pretext. *Id.* MetLife policy provided guidelines for associate management, including "providing written warnings, establishing measurements of improvement to gauge success, [and] providing a copy of the warning to the associate immediately after the performance meeting." *See* 56.1 ¶ 306 (internal punctuation marks omitted). The policy also gave managers discretion "to use any form of discipline, consistent with law, that it determines . . . is appropriate under the circumstances, up to and including termination." *Id.* First, as discussed above, there is a dispute about the number of warnings Macropoulos received before her termination. *See* Part I.C.7 *supra.* Assuming that a jury could credit Macropoulos' position, although failure to follow internal guidelines may be relevant to the pretext determination, it is not sufficient, standing along, to demonstrate an inference of discrimination. *See Villar v. City of New York*, 135 F. Supp. 3d 105, 125 (S.D.N.Y. 2015) (citing *Bagley v. J.P. Morgan Chase & Co.*, No. 10 Civ. 1592 (PGG), 2012 WL 2866266, at *15 (S.D.N.Y. July 12, 2012)).

*Elec. Servs. LLC*, No. 11 Civ. 5528 (MKB), 2014 WL 4773975, at *12 (E.D.N.Y. Sep. 24, 2014) (citing *Ruiz v. County of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)). Moreover, she must be "similarly situated *in all material respects* to the individuals with whom she seeks to compare herself." *Brown v. Daikin America Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 20 F.3d 34, 39 (2d Cir. 2000) (emphasis added)). In the case of a plaintiff's termination or punishment, she must show that her co-employees were "subject to the same performance evaluation and discipline standards" and that the employees who went undisciplined engaged in conduct of comparable seriousness. *Graham*, 20 F.3d at 40. Macropoulos has shown that some of her fellow Unit employees were late, and some used profanity, but she has not shown that they were "similarly situated," because the evidence shows that Macropoulos was frequently late *and* used profanity and derogatory terms about Zanghi *and* had difficulty with the timeliness of her work product *and* was at least occasionally unreachable when telecommuting. Because the comparator employees Macropoulos mentions engaged in only one type of conduct that MetLife stated contributed to Macropoulos' termination, their conduct was not of "comparable seriousness." Thus, while Macropoulos' minimal evidence of differential treatment may have been enough to raise a *prima facie* claim, it is not enough to demonstrate that MetLife's reasons for terminating her were merely pretextual.

### c) Macropoulos' Failure to Meet Deadlines

Responding to MetLife's complaints about Macropoulos' work product, Plaintiff argues that those undisputed instances do not mean that her performance overall was unsatisfactory. For example, she argues that on November 22, 2013, when Varady asked her why he did not have a particular assignment from her, she had not previously understood that Varady wanted a "more substantial analysis" than the short write-up she had already sent. *See* 56.1 ¶ 115. She

argues that she was therefore not "late" when she sent him the analysis on November 25, 2013. *Id.* ¶ 116.  Similarly, Macropoulos argues that although she missed a December 6, 2013 deadline, it was because Varady did not provide her with the supporting materials she needed to complete the assignment.  *Id.* ¶ 119.  Macropoulos' grievances may be legitimate, and Varady may not have been particularly clear in giving Macropoulos assignments and establishing deadlines.  But courts do not act as "super-personnel departments."  *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 454 (S.D.N.Y. 2013) (quoting *Ghent v. Moore*, 324 F. App'x 55, 57 (2d Cir. 2009)).  Even if it were true that MetLife did not give Macropoulos the tools she needed to complete assignments in a timely fashion, that would not transform MetLife's dissatisfaction with Macropoulos' performance into illicit discrimination.

### d)  Macropoulos' Performance Reviews

Finally, Macropoulos argues that her generally positive performance reviews prior to 2013 show that MetLife's reasons for her termination are merely pretextual.  Macropoulos' reviews prior to 2013 were all largely positive.  *See* 56.1 ¶ 32.  In 2012, Varady wrote that Macropoulos generally exceeded her objectives, and was a successful contributor to the Unit.  *Id.* Macropoulos also received positive reviews from internal clients and stakeholders.  *Id.*

Positive performance reviews prior to termination can demonstrate pretext.  *See Boakye-Yiadom v. Laria*, No. 09 Civ. 622 (DRH), 2012 WL 5866186, at *7 (S.D.N.Y. Nov. 19, 2012) ("While the Court acknowledges that a change in an employee's performance evaluation cannot by itself raise an inference of pretext, especially when a new supervisor is appointed, [the plaintiff] received this negative evaluation notwithstanding the fact that his prior reviews were exemplary and [the defendant] was superintendent for just over two months.") (internal citations omitted).  MetLife argues that Macropoulos' past reviews should be given little weight, because

Zanghi had never previously reviewed Macropoulos' work.  *See* Reply Mem. at 6 (citing *Grant v. Cont'l Cas. Co.*, No. 13 Civ. 5675 (AT), 2015 WL 1499724, at *10 (S.D.N.Y. Mar. 30, 2015)).  But *Grant* simply states that earlier positive reviews, standing alone, do not create a genuine issue of material fact.  The earlier reviews are therefore relevant, even if not determinative, to Macropoulos' showing of pretext.

Here, however, the Court finds that Macropoulos' prior reviews were not uniformly positive.  Indeed, the performance issues for which Macropoulos was ultimately terminated were apparent in earlier reviews.  In Macropoulos' 2011 review, for example, Varady wrote, "If there is something still needing greater attention it is the need in some instances to more quickly respond to a deadline."  Macropoulos Decl. Ex. 6.  In February 2013, acknowledging negative feedback she had received, Macropoulos noted that one of her "development strategies" for the year would be "to timely deliver work product and sufficiently communicate challenges regarding work to my mangers."  *Id.* Ex. 8.  During her mid-year review with Zanghi and Varady in September of that year, Varady stated again that he and another Unit attorney "had issues with timeliness for our projects from [Macropoulos]."  O'Keefe Decl. Ex. 12.  Zanghi further informed Macropoulos that the department was reducing in size, and that she was worried about being able to justify Macropoulos' employment given her work habits:

> The truth of the matter is this year, next year, through 2016, people in the law department will by mandate lose their jobs . . . .  So I think the problem we have, part of it is perception, is it is very hard for [a senior counsel at MetLife], let's say, who owns basically half the law department, to take . . . a number of people that he needs to cut and to be hearing from other unit heads, "but those people in tax product have an attorney that's only here half the time, but getting paid like a full-time attorney."

*Id.*

There is also evidence in Macropoulos' earlier reviews of behavioral problems.  In her 2012 "stakeholder" reviews, William Arbo stated that Macropoulos had "a strong personality" and added that "there are moments where she might want to consider pulling back."  Raskin Decl. Ex. S.  Finally, in Macropoulos' mid-year review meeting, Zanghi informed Macropoulos that "there is a perception that you yell at people . . . or particularly yelling at [Varady] or yelling at your colleagues in the office, we have to nip that in the bud."  O'Keefe Decl. Ex. 12.

Thus, this is simply not a case in which a there was a sudden decline in performance evaluations immediately preceding termination.  *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 743 (2d Cir. 2014) (comparing cases in which a supervisor's reviews are consistent, supporting the defendant's legitimate reasons for termination, and those in which there is a "sudden decline," which might support a plaintiff's theory of discrimination). Given this, the Court finds that Macropoulos has not put forward "sufficient evidence" from which a factfinder could conclude that MetLife's legitimate, nondiscriminatory reasons for terminating her employment were "false."  *Cf. Weinstock*, 224 F.3d at 42 (setting forth the standard for surviving a motion for summary judgment).  The Court therefore GRANTS MetLife's motion for summary judgment on Macropoulos' ADA claim.[19]

## IV.    FAMILY AND MEDICAL LEAVE ACT

### A.    FMLA Interference

To prove FMLA interference, a plaintiff must establish that the defendant "denied or otherwise interfered with a benefit to which she was entitled under the FMLA."  *Graziadio*, 817

---

[19] MetLife has also moved for summary judgment on Macropouls' NYCHRL discrimination claim.  Where, as here, all federal law claims are eliminated before trial, the "traditional values of judicial economy, convenience, fairness, and comity" weigh in favor of declining to exercise supplemental jurisdiction over any remaining state law claims. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (internal quotation marks omitted)).  Because the standards for summary judgment are not the same, and because the Court dismisses all of Macropoulos' federal claims, the Court declines to exercise supplemental jurisdiction over her NYCHRL claim.  28 U.S.C. § 1367(c)(3).

F.3d at 424. Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Ejiogu v. Grand Manor Nursing and Rehab. Ctr.*, No. 15 Civ. 505 (DLC), 2017 WL 1184278, at *5 (S.D.N.Y. Mar. 29, 2017) (quoting *Potenza v. City of New York*, 364 F.3d 165, 167 (2d Cir. 2004)). Therefore, she must show: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Id.* (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 109 (2d Cir. 2017)). MetLife argues that Macropoulos cannot complain of FMLA interference because she never requested FMLA leave. Def.'s Mem. at 12–15.

Under the FMLA, an employee must provide at least thirty days' notice, or, if the timing of the leave is not foreseeable, notice is required "as soon as [is] practicable." 29 C.F.R. § 825.302. Further, an employee must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b); *see also Coutard*, 848 F.3d at 111–12 (noting that the notice requirement applied even under earlier, stricter regulations). However, she "need not expressly assert rights under the FMLA or even mention the FMLA." *Id.* Instead, "the employer will be expected to obtain any additional required information through informal means." *Id.*

First, MetLife argues that because Macropoulos was aware of her FMLA rights based on prior work experience, it had no obligation to help Macropoulos determine whether FMLA leave might be appropriate. Def.'s Mem. at 13–14. But the FMLA regulations do not impose such a requirement, and courts in this Circuit have recognized that an employer's obligations under the FMLA are not excused based on the plaintiff's familiarity with the statute. *E.g.*, *Debell v.*

*Maimonides Med. Ctr.*, No. 09 Civ. 3491 (SLT), 2011 WL 4710818, at *8 (E.D.N.Y. Sep. 30, 2011) ("Defendant argues that because Plaintiff was aware of the procedure for requesting and obtaining a leave of absence under the FMLA . . . he specifically declined to request FMLA leave in the instant case. This argument, however, is unavailing. An employee is not required to request FMLA leave by name.").[20]

Next, MetLife argues that its knowledge of Mrs. Macropoulos' condition did not trigger its duty to inform Macropoulos of her eligibility to take FMLA leave, because MetLife only knew of Macropoulos' desire to have a flexible working schedule, not her willingness to take leave. Def.'s Mem. at 15. MetLife points to *Barletta v. Life Quality Motor Sales, Inc.*, in which a court in the Eastern District of New York determined that a plaintiff's reduced work schedule and cardiologist visits did not put the employer on notice of an intent to take FMLA leave, because "an intention to continue working, whether full time or part time . . . is the opposite of an intention to take FMLA leave." *Barletta*, No. 13 Civ. 2480 (DLI), 2016 WL 4742276, at *6 (E.D.N.Y. Sep. 12, 2016).

Although FMLA regulations do not require an employee to mention the FMLA specifically, they do require an employee to request leave, not just an accommodation. *See* 29 C.F.R. § 825.303(b) (requiring that an employee "provide sufficient information for an employer to reasonably determine whether the FMLA may apply *to the leave request*") (emphasis added). In all of the cases to which Macropoulos cites, the plaintiff requested some form of leave from employment. *See Barnett v. Revere Smelting & Ref. Corp.*, 67 F. Supp. 2d 378 (S.D.N.Y. 1999)

---

[20] MetLife argues that *Debell* and similar cases are distinguishable because "those plaintiffs' familiarity was based on their own leaves and their awareness of their employer's FMLA policies. . . . By contrast, Plaintiff's knowledge is based on her experience as an attorney who advised a law firm practice group on FMLA issues as well as her own independent research into the FMLA." Reply Mem. at 8 n.8. Although this is a factual distinction that bears some logical force, MetLife provides no legal support as to why or how its obligations under the FMLA would be different in each context.

(denying summary judgment where the plaintiff called his employer and said that he was suffering from chest pains, had difficulty breathing, and would be unable to work that day); *Jennings v. Parade Publ'n*, No. 01 Civ. 8590 (TPG), 2003 WL 22241511 (S.D.N.Y. Sep. 30, 2003) (denying summary judgment where a plaintiff requested FMLA leave by name and shortly thereafter requested a modified work schedule); *Debell*, 2011 WL 4710818 (denying summary judgment where the plaintiff called his supervisor and informed her that his chronic illness was bothering him and prevented him from working that day). Although Macropoulos informed MetLife of her mother's condition on numerous occasions and explained she needed flexibility with respect to in-office time to care for her mother, she never requested any form of leave, including intermittent or reduced schedule leave. Instead, she sought from MetLife a telecommuting arrangement, and, for the entirety of her employment with MetLife, telecommuted for a substantial portion of each workweek. A reasonable juror could not determine that Macropoulos' desire to maintain her telecommuting flexibility put MetLife on notice that she desired FMLA leave; therefore, MetLife's motion for summary judgment is GRANTED.

## B. FMLA Retaliation

To establish a claim for FMLA retaliation, a plaintiff must demonstrate that: "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for [her] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429 (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)). Retaliation claims are analyzed under the *McDonnell Douglas* framework. It is undisputed that Macropoulos never took FMLA leave. As discussed above, Macropoulos also cannot establish

that she requested FMLA leave. Therefore, Macropoulos' claim for FMLA retaliation fails on the first element, because she did not exercise FMLA rights during her tenure at MetLife.

## V.    CONCLUSION

For the reasons stated above, Defendant's motion is GRANTED. The Clerk of Court is respectfully directed to terminate the motion (Doc. 43) and close the case.

It is SO ORDERED.

Dated:    Mach 26, 2018
          New York, New York

Edgardo Ramos, U.S.D.J.